**Elida AYALA, Individually and as Representative of the Estate of Ramon Ayala et al., Appellants,**

v.

**Teresita T. BARTOLOME d/b/a Captain Wick's Seafood Restaurant, Appellee.**

No. 11–95–072–CV.

Court of Appeals of Texas, Eastland.

Jan. 23, 1997.

728

Ronald Franklin, Silva Barnwell, Franklin, Cardwell & Jones, Houston, for appellants.

Ann Knight, John B. Geddie, P.J. Murphey Harmon, Kross & Tract, Houston, Robert D. Brown, Donato & Assoc., Houston, for appellee.

Before ARNOT, C.J., and DICKINSON and WRIGHT, JJ.

OPINION

ARNOT, Chief Justice.

Ramon Ayala suffered from liver disease secondary to the long usage of alcohol (cirrhosis of the liver). Ayala and his family dined at Captain Wick's Seafood Restaurant. Ayala consumed two dozen raw oysters. A few days later, Ayala became sick, was admitted to the hospital, and subsequently died of septicemia. The septicemia was attributed to the bacteria vibrio vulnificus which is sometimes found in raw oysters. Because of his immunosuppressed condition, Ayala could not digest the bacteria found in the oysters.

Ayala's family [1] sued Captain Wick's urging, as theories for recovery, actions in common-law negligence for failure to warn of the dangers in eating raw oysters, for strict liability under RESTATEMENT (SECOND) OF TORTS § 402A (1965) and claiming that Captain Wick's breached an implied warranty of fitness for human consumption.[2] The trial court granted Captain Wick's motion for summary judgment. Because we find that there are genuine issues of material fact raised by the evidence, we reverse the judgment of the trial court and remand the cause for trial.

### STANDARD OF REVIEW

When reviewing a summary judgment, this court will adhere to the following standards:

(1) The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

(2) In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

(3) Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

TEX.R.CIV.P. 166a; *Goswami v. Metropolitan Savings and Loan Association,* 751

S.W.2d 487, 491 (Tex.1988); *Nixon v. Mr. Property Management Company, Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985); *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671 (Tex.1979). Captain Wick's had the burden to establish by summary judgment proof that, as a matter of law, there was no genuine issue of material fact as to one or more of the essential elements of appellants' cause of action. *Arnold v. National County Mutual Fire Insurance Company,* 725 S.W.2d 165 (Tex.1987). *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105 (Tex.1984). *Gibbs v. General Motors Corporation,* 450 S.W.2d 827 (Tex.1970).

The summary judgment evidence and the arguments discussing appellants' causes of action for breach of implied warranty and for strict liability are related. We will discuss appellants' points of error challenging the trial court's granting of appellee's summary judgment under these theories. Because this is a summary judgment case and because we find the presence of a fact issue, we do not reach appellants' other points of error. TEX.R.APP.P. 90(a).

### BREACH OF IMPLIED WARRANTY

In their petition, appellants alleged that the oysters served by Captain Wick's were not fit for human consumption. In Texas:

[A] retailer who sells unwholesome food for human consumption is liable to the consumer for the consequences under an implied warranty imposed by law as a matter of public policy, even though ... the retailer has no means of knowing that the contents are unfit for human consumption.

*Griggs Canning Co. v. Josey,* 139 Tex. 623, 164 S.W.2d 835, 840 (1942); *Jacob E. Decker & Sons v. Capps,* 139 Tex. 609, 164 S.W.2d 828 (1942).

Captain Wick's argues that the summary judgment evidence conclusively shows that the oysters they served were wholesome

---

1. Elida Ayala, Individually and as Representative of the Estate of Ramon Ayala; Ramon Ayala, Jr.; Lydia Vasquez; Raphael Ayala; Jessie Ayala; Belinda Romero; Eva Munoz; and Norma Chicherski.

2. Ayala also contends that, by breaching the implied warranty of fitness, Captain Wick's violated the Texas Deceptive Trade Practices Act, TEX. BUS. & COM.CODE ANN. § 17.50 (Vernon Supp.1997).

and fit for human consumption because (1) it had no way of determining that the oysters had the bacteria and that it had not violated any Texas Health regulations or laws and (2) that no one else who ate the oysters at the restaurant during the time period had gotten sick and that the principal reason for Ayala's death was his pre-existing liver condition.

First, Captain Wick's asserts that the summary judgment evidence shows that Captain Wick's did not know about the bacteria or the risk that it posed to immunosuppressed people and that no other patron who dined in the restaurant that night other than Ayala got sick. John J. Mathewson, Ph.D., is an assistant professor of infectious diseases at The University of Texas Health Science Center at Houston—Medical School. In his affidavit, he states:

> [Captain Wick's] would not have had any way [to] know that their oysters were contaminated with this organism because oysters are not routinely screened for V[ibrio] vulnificus. Texas state regulations for harvesting safe shellfish are based on fecal coliform counts which tell nothing about the presence of V[ibrio] vulnificus.

The tests for fecal coliform counts are tests of the waters from which the oysters are harvested and not the oysters themselves.

Ruben Martinez of the Harris County Health Department, who is an environmental health specialist, concluded in his deposition that there was no improper handling of the oysters by Captain Wick's. Martinez testified that he knew of the presence of vibrio vulnificus bacteria in raw oysters through reports from the oyster industry, restaurant suppliers, restaurant owners, and the government. Martinez, a registered sanitarian who inspected Captain Wick's, noted that no health citations were issued.

This evidence does not conclusively establish that the oysters consumed by Ayala were fit for human consumption. Rather, the summary judgment evidence establishes that Captain Wick's had no way of determining whether the oysters had the bacteria and that Captain Wick's had not mishandled the food. However, as set out in *Griggs* and *Decker*, knowledge or mishandling by the retailer are not issues or defenses.[3]

Next, Captain Wick's urges that the principal reason for Ayala's death, by whatever means he was exposed to the vibrio vulnificus bacteria, was his preexisting liver condition. Dr. Mathewson, in his affidavit, gave his opinion from a review of Ayala's medical records that Ayala's death was a "textbook case of fatal Vibrio vulnificus infection." Other summary judgment evidence established that this risk was not limited to consumers whose liver was damaged solely from alcohol abuse but that all people with damaged livers from other diseases such as diabetes, cancer, or hepatitis were at risk. Dr. Mathewson's affidavit states that most oysters from the Galveston Bay complex are contaminated with this common marine bacterium. This evidence does not conclusively establish that the oysters served by Captain Wick's were fit for human consumption. The fact that other people did not die from eating the oysters does not conclusively establish that they were safe. Neither does the fact that essentially all oysters contain this bacteria mean that they were safe. Indulging every reasonable inference in favor of Ayala, the summary judgment evidence creates a fact issue concerning whether Ayala's death was caused from the ingestion of unwholesome food.

### SECTION 402A; STRICT LIABILITY

In their petition, appellants also assert a cause of action for strict liability under Section 402A. The strict liability imposed under a theory of warranty, as established by *Griggs* and *Decker*, even though historically an action sounding in tort, is an entirely different theory of strict liability than under Section 402A. In *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967), the court explicitly stated: "Insofar as foodstuffs for human consumption are concerned, this section [402A] states the law as followed in Texas." In *McKisson*, the adoption of Section 402A severed strict liability from its roots in warranty law and opened it up to

**3.** A distinction must be made between "knowledge" under an implied warranty of fitness of foods and the "knowledge" necessary to establish additional damages under Section 17.50(a)(1).

products other than food and drink. See W. PAGE KEETON ET AL, PROSSER AND KEETON ON THE LAW OF TORTS §§ 97 & 98, at 690–694; Section 402A cmt. b. As foodstuffs, raw oysters are subject to strict liability under Section 402A. See *McKisson v. Sales Affiliates, Inc.,* supra.

Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

In its motion for summary judgment, Captain Wick's first argued that oysters are not a "product" under Section 402A. On appeal, Captain Wick's argues that, because the oysters are served raw, the bacteria found in the oysters occurs naturally and that, because the restaurant makes no preparation of the oysters other than removing one of the two shells, the oysters are not manufactured and are not products as contemplated by the Restatement. Captain Wick's urges that to be a product the commodity must be "made or produced by man." See *Houston Lighting & Power Company v. Reynolds,* 765 S.W.2d 784 (Tex.1988). We disagree. To place such a narrow restriction on the defini-

tion of product would be to ignore the history of strict liability for servers of food.

Since the early days of common law, those engaged in the business of selling food intended for human consumption have been held to a high degree of responsibility for their products. See Section 402A cmt. b. Moreover, *Houston Lighting & Power Company* extended, not restricted, the concept of strict liability that had historically been applied to foods, to other products. See also *McKisson v. Sales Affiliates, Inc.,* supra.

Although the court in *Griggs* addressed the issue of strict liability under a theory of implied warranty rather than under Section 402A, we believe that the court's reasoning is applicable to Captain Wick's arguments before us. In *Griggs,* the court addressed the question of whether a:

[R]etail merchant who buys canned food intended for human consumption from a manufacturer, and sells same to his customer for immediate consumption, is liable in damages for the injuries caused to the consumer thereof by reason of the unwholesomeness of such food.[4]

In *Griggs,* as in the case before us, the restaurant did not make, process, or produce the unwholesome food, the restaurant merely served the food. The court in *Griggs* held that the restaurant was liable.[5] Simply because it does not process the food, a restaurant is still subject to Section 402A for the sale of foods. Section 402A(1)(b); see *McKisson v. Sales Affiliates, Inc.,* supra.

Having held that raw oysters, being food, are products subject to Section 402A, we will now review the summary judgment evidence using the applicable standard of review to determine whether there is a question of material fact whether the oysters were in a defective condition unreasonably dangerous to the consumer.

■ Captain Wick's argues that it has conclusively shown that the consumption of raw

---

4. The rule stated applies to the operator of a restaurant. See Section 402A cmt. f.

5. Normally, the rule stated in this section will be applied to articles which already have undergone some processing before sale, since there is today little in the way of consumer products which will

reach the consumer without such processing. The rule is not, however, so limited; and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated. See Section 402A cmt. e.

oysters containing the bacteria is not unreasonably dangerous to the normal healthy patron. Dr. Mathewson confirmed that: "In the case of V[ibrio] vulnificus infection due [to] eating raw oysters, the vast majority of healthy people do not become ill from raw oysters contaminated with this bacteria." However, there is no question that the vibrio vulnificus bacteria is highly dangerous to people who suffer an immunosuppressed condition. It is fatal. The summary judgment evidence shows that, for people who are immunosuppressed, who become infected with the vibrio vulnificus bacteria, and who do not receive treatment, the mortality rate is 100 percent. Even for those people who do receive treatment, the mortality rate exceeds 50 percent. Dr. Mathewson stated that there are 10 to 20 deaths a year nationwide from vibrio vulnificus infection.

█ In order for it to be "unreasonably dangerous," the product must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Section 402A cmt. i; see also *Jim Dandy Fast Foods, Inc. v. Carpenter*, 535 S.W.2d 786 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ). Whether such a danger would be contemplated by the ordinary consumer is a question of fact.

Captain Wick's argues that it is common knowledge to the public that the act of eating uncooked meat carries an element of danger, citing naturally-occurring bacteria such as salmonella, and parasites such as trichinosis. However, it is not common knowledge that eating raw oysters could be fatal. Dr. Mathewson also stated that:

Patients with liver problems, particularly alcoholic cirrhosis, who eat raw oysters have an 80 times greater risk of acquiring this infection and over 200 times greater risk of death due to this infection, than do healthy people who ingest the same raw shellfish.

This summary judgment evidence does not conclusively establish that the bacteria is not unreasonably dangerous to the ordinary consumer. Rather, it establishes that there is a fact question of whether healthy people who eat raw oysters contaminated with the bacteria are also susceptible to the infection.[6]

█ Finally, Captain Wick's argues that Ayala cannot prove that the oysters which he ate at Captain Wick's contained the bacteria. Section 402A cmt. g states:

The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him ... The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.

---

6. We do not find any cases in Texas dealing with this issue. However, we have found two published cases from other jurisdictions which addressed the application of strict liability to restaurants which served oysters that contained naturally-occurring vibrio vulnificus and cholera bacteria.

In *Simeon v. Doe*, 618 So.2d 848 (La.1993), the Supreme Court of Louisiana held that oysters containing the vibrio vulnificus bacteria were not subject to strict liability. See LA.CIV.CODE ANN. arts. 2317–22. It should be noted that Louisiana had an express statute that, La.R.S. 9:2800.52(6), specifically exempted harvesters and other producers of oysters in their natural state from the scope of the Louisiana strict liability act. In *Simeon*, the court found that the defect, that is immunosuppressed condition, was in the person and not in the oyster. The Louisiana court compared the bacteria's effect on a person with an immunosuppressed condition to sugar's effect on a diabetic.

However, unlike the statutory authority in Louisiana, Section 402A has never been applied to products which are safe if consumed in moderation. See Section 402A cmt. j. A seller is not required to warn with respect to products which are only dangerous when consumed in excessive quantities over long periods of time, using foods that contain saturated fats as an example.

In *Cain v. Sheraton Perimeter Park South Hotel*, 592 So.2d 218 (Ala.1991), a patron sued a hotel and its restaurant alleging that he contracted hepatitis from consuming raw oysters served by the restaurant. This case was reviewed from a summary judgment standard. The Supreme Court of Alabama held that a fact question was presented as to whether a patron should have reasonably expected that raw oysters may have been contaminated.

These are questions of fact to be decided by the jury. While the consumer may have the burden at trial to prove that the product was in a defective condition when it left the seller, the case before us is reviewed from a summary judgment standpoint, that is, all presumptions are construed against the movant.

Because we find that there are material questions of fact that are not conclusively established, we reverse the summary judgment of the trial court and remand the cause for trial.

ARNOT, C.J., and DICKENSON and WRIGHT, JJ., concur.